**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANCIS J. DENNIS, on behalf of himself and all others similarly situated, and derivatively on behalf of the FEDERAL NATIONAL MORTGAGE ASSOCIATION<br><br>                                              Plaintiff,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association, THE UNITED STATES DEPARTMENT OF THE TREASURY,<br>                                              Defendants,<br><br>     and<br><br>THE FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br>                                              Defendant<br>                                              and Nominal<br>                                              Defendant. | **CLASS ACTION AND DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

## CLASS ACTION AND DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

**Page**

NATURE AND SUMMARY OF THE ACTION .......................................................... 1

JURISDICTION AND VENUE ................................................................................. 8

THE PARTIES......................................................................................................... 9

FACTS ................................................................................................................... 10

    A.    FANNIE MAE .......................................................................................... 10

    B.    FANNIE MAE IS PLACED INTO CONSERVATORSHIP ............................. 14

    C.    FANNIE MAE DEMONSTRATES SIGNS OF A STRONG
        RECOVERY AND SUBSTANTIAL PROFITABILITY .................................... 20

    D.    THE FHFA AND THE TREASURY EFFECTIVELY SEIZE ALL
        OF FANNIE MAE'S PROFITS IN PERPETUITY THROUGH THE
        NET WORTH SWEEP ............................................................................... 20

    E.    BY ENTERING INTO THE NET WORTH SWEEP, THE FHFA
        AND THE TREASURY VIOLATED THEIR FIDUCIARY
        OBLIGATIONS TO FANNIE MAE ............................................................. 25

CLASS ACTION ALLEGATIONS .......................................................................... 26

FHFA'S MANIFEST CONFLICT OF INTEREST .................................................... 28

CAUSES OF ACTION ............................................................................................ 30

    COUNT I BREACH OF CONTRACT  (Against Fannie Mae and the FHFA)............. 30

    COUNT II  BREACH OF THE IMPLIED COVENANT OF GOOD
        FAITH AND FAIR DEALING
        (Against Fannie Mae and the FHFA) ......................................................... 31

    COUNT III BREACH OF FIDUCIARY DUTY
        (Against the Treasury and the FHFA) ......................................................... 32

PRAYER FOR RELIEF .......................................................................................... 34

JURY TRIAL DEMANDED .................................................................................... 35

Plaintiff Francis J. Dennis ("Plaintiff"), by the undersigned attorneys, submits this Class Action and Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and a class (the "Class," as defined herein) of holders of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S ("Series S Preferred Stock") or 8.25% Non-Cumulative Preferred Stock, Series T ("Series T Preferred Stock") of defendant and nominal defendant Federal National Mortgage Association ("Fannie Mae" or the "Company"), seeking damages and equitable relief, including rescission, for breach of contract or, in the alternative, breach of the implied covenant of good faith and fair dealing, and a derivative action brought by Plaintiff on behalf of Fannie Mae, seeking damages and equitable relief, including rescission, for breach of fiduciary duty, in connection with the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Amended PSPA"), between the defendant United States Department of the Treasury ("Treasury") and the defendant Federal Housing Finance Agency ("FHFA") in its capacity as conservator for Fannie Mae.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based on, *inter alia*, the investigation of Plaintiff's counsel, Grant & Eisenhofer P.A.

2.      Fannie Mae is a government-sponsored enterprise chartered by the U.S. Congress that was intended to enhance the liquidity and stability of the mortgage market and make housing in the U.S. more affordable and available to low- and moderate-income Americans.  Its activities included providing funds to lenders by purchasing mortgages, and issuing and guaranteeing mortgage-backed securities to facilitate the flow of additional funds into the mortgage market.

Although Fannie Mae was chartered by the U.S. Congress, the U.S. government did not guarantee, directly or indirectly, its securities or other obligations.  Fannie Mae was a stockholder-owned corporation, and, before the 2008 financial crisis, its business was self-sustaining and funded exclusively with private capital.

3.     To raise capital, Fannie Mae issued several classes of preferred stock, including the Series S Preferred Stock and Series T Preferred Stock purchased by Plaintiff and the other members of the Class.  Investors in the Series S Preferred Stock and Series T Preferred Stock had limited rights to non-cumulative dividends and liquidation preferences in priority to Fannie Mae's common stockholders and the holders of junior preferred stock.

4.     For most of its existence, Fannie Mae was consistently profitable, and its securities were widely considered to be very safe.  Beginning in 2007, however, turmoil in the housing and mortgage markets, a loss of liquidity in credit markets, and volatility in capital markets had an adverse impact on Fannie Mae (along with many other institutions that had significant exposure to mortgage markets).  In 2007, Fannie Mae suffered its first annual net loss since 1985.  Despite this loss, the Company remained adequately capitalized.  Fannie Mae's regulator at that time, the Office of Federal Housing Enterprise Oversight (the "OFHEO"), continued to emphasize Fannie Mae's soundness and the positive effects that it was having on the overall mortgage and financial markets during a nationwide crisis.

5.     As macroeconomic conditions worsened, Congress sought ways to infuse confidence into the markets.  In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), establishing the FHFA as Fannie Mae's regulator, and providing a list of circumstances under which the FHFA would have the power to place Fannie Mae into conservatorship or receivership.  In the Congressional hearings leading up to the

passage of HERA, both the Secretary of the Treasury and the Chairman of the Federal Reserve testified that Fannie Mae was adequately capitalized.  Likewise, on July 10, 2008, the OFHEO issued a press release stating that Fannie Mae was "adequately capitalized, holding capital well in excess of the OFEHO-directed requirement, which exceeds the statutory minimums.  [Fannie Mae, along with the Federal Home Loan Mortgage Corporation ('Freddie Mac'),] have large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets."

6.      Nonetheless, less than two months after HERA was passed, the turmoil that was wracking the markets and disrupting the macroeconomy, combined with more severe problems at Freddie Mac, drove FHFA to place Fannie Mae and Freddie Mac under conservatorship.  At the time the conservatorship was announced, the FHFA claimed that its goal was to return Fannie Mae to normal business operations, and that once the Company had been restored to a safe and solvent condition, the conservatorship would be terminated.

7.      According to the FHFA's press release, the conservatorship was "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized."  The FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore [Fannie Mae] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship.  At present, there is no exact time frame that can be given as to when this conservatorship may end."

8.      The day after the conservatorship was imposed, the Treasury exercised its temporary HERA authority to enter into a series of agreements with FHFA to purchase Fannie Mae securities.  Fannie Mae issued a newly created series of Senior Preferred Stock, and in

3

return for its commitment to purchase this stock, the Treasury received $1 billion of Senior Preferred Stock and warrants to acquire 79.9% of Fannie Mae's common stock at a nominal price.  The Treasury also established a $100 billion lending facility for Fannie Mae (later increased in size to $200 billion) and committed to make quarterly purchases of Senior Preferred Stock from Fannie Mae so as to ensure that Fannie Mae's liabilities did not exceed its assets. The Senior Preferred Stock ranked senior to all other preferred stock and  and entitled Treasury to a cumulative dividend of 10% percent of the "outstanding liquidation preference") (the sum of the $1 billion commitment fee The Senior Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws that Fannie Mae has made on Treasury's funding commitment, plus the total amount of Senior Preferred Stock outstanding).   The warrants provided Treasury with an "upside" return, beyond the 10% coupon on the Senior Preferred Stock, so as to allow the Treasury to capitalize from its investments if Fannie Mae returned to profitability.

9.     Soon after the commencement of the conservatorship, Fannie Mae declared huge non-cash losses, including write-downs of the value of tax assets and loss reserves, requiring Fannie Mae to draw down on the Treasury's funding commitment.  Furthermore, because Fannie Mae was required to pay dividends on the Senior Preferred Stock, Fannie Mae was forced to further draw upon  its funding commitment from the Treasury so that it could pay dividends to the Treasury.

10.     The Treasury's power to purchase Fannie Mae securities was a temporary authority established under Section 1117 of HERA.  This authority expired on December 31, 2009.  Prior to the expiration of its authority, Treasury made two substantive amendments to the stock purchase agreements.

11.     In 2012, Fannie Mae began to experience a vigorous recovery, pulling in a $7.8 billion profit in the first half of the year alone.  It also became clear that Fannie Mae's early write-downs had greatly overestimated the Company's likely losses, and that Fannie Mae might soon be able to release more than $50 billion in deferred tax assets that it had written off in 2008. Given these promising results and the recovery of the overall housing market, it was clear that Fannie Mae would likely be able to repay to the government every taxpayer dollar that it had received with interest and resume its ordinary operations in a safe and solvent condition, the goal of the conservatorship articulated by FHFA at the time the conservatorship was imposed.

12.     Yet this was not enough for the FHFA or the Treasury.  In August 2012, just ten days after Fannie Mae had announced its earnings for the second quarter, the FHFA and the Treasury entered into a third amendment of the stock purchase agreement – the Amended PSPA – permitting Treasury to take the entire positive net worth of Fannie Mae each quarter in dividends (with the exception of a $3 billion capital reserve amount for 2013, which will be reduced by $600 million each year until it reaches zero on January 1, 2018).  Fannie Mae and its private shareholders received no investments or value of any sort in exchange.

13.     This so-called "Net Worth Sweep," circumvented the rules of priority and expropriated for the government the remaining value of the preferred stock and common stock still held by private investors.  The Treasury and FHFA have both emphasized that under this dividend structure, the Treasury will receive – in perpetuity – any and all profits that Fannie Mae earns, and that it will be effectively impossible for Fannie Mae to ever have a positive net worth, emerge from its conservatorship and return to the private market.  In an August 17, 2012 press release, the Treasury announced that the Net Worth Sweep was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will . . . benefit taxpayers."  Rather

than seeking to return Fannie Mae to a safe and solvent condition and recover the taxpayers' investment, the FHFA and the Treasury are using it as a cash cow until such time as they can wind it down entirely.

14.     The Treasury has already reaped enormous benefits form the Net Worth Sweep. On or about June 30, 2013, Fannie paid the Treasury a dividend of ***$59.4 billion.***  As of June 30, 2013, Fannie Mae had paid $95 billion in dividends to the Treasury, and drawn $116.1 billion. Yet the Treasury and the FHFA maintain that this represents a windfall profit, rather than a return of capital invested, such that the liquidation preference of the Senior Preferred Stock has not changed and remains at $117.1 billion.

15.     The Net Worth Sweep has stripped Fannie Mae of its ability to rebuild its capital reserves or to distribute dividends to Plaintiff, the other members of the Class, or other holders of Fannie Mae stock.  Furthermore, Fannie Mae is not permitted to redeem the Treasury's Senior Preferred Stock.  Moreover, by appropriating the entirety of Fannie Mae's net worth for the government's coffers on a quarterly basis, the Net Worth Sweep has effectively eliminated the property and contractual rights of Plaintiff and the Class to receive their liquidation preference upon the dissolution, liquidation or winding up of Fannie Mae.  Indeed, the FHFA and the Treasury took away the Class's rights:

> o   To receive dividend payments.  Under the terms of the Series S Preferred Stock's certificate of designation and the Series T Preferred Stock's certificate of designation, Fannie Mae owed Plaintiff and the other members of the Class dividends, if declared, to the extent that Fannie Mae earned profits above and beyond its requirement to pay the 10% dividend on the Treasury's Senior Preferred Stock.  As of the second quarter of 2012, the quarters leading up to this

filing, and for the foreseeable future, Fannie Mae's profits have exceeded or will likely exceed that threshold; and

o  To receive a liquidation distribution upon Fannie Mae's dissolution, liquidation or winding up, a right which was still worth a substantial amount of money even though it was junior to the liquidation preference of the Senior Preferred Stock.

16.     Plaintiff and the other members of the Class paid valuable consideration in exchange for these contractual rights, and in doing so helped provide financial support for Fannie Mae's business both before and after the imposition of the conservatorship.  Indeed, even after the imposition of the conservatorship, the contractual rights of Plaintiff and the other members of the Class had substantial market value – market value that swiftly dissipated in the wake of the Net Worth Sweep.

17.     The current projections for Fannie Mae's continued profitability show that over approximately the next year, it will be able not only to repay all of the money it drew down from the Treasury, but also to pay the requisite 10% annual dividend.  But for the Net Worth Sweep, Fannie Mae would be capable of paying billions in dollars in profits to the holders of its other preferred stock, including the members of the Class.  Due to the Net Worth Sweep, that money will all accrue to the Treasury instead.  The Treasury will receive a massive surplus above and beyond its pre-Amended PSPA contractual entitlements, and Plaintiff and the other members of the Class will receive nothing.

18.     Entry into the Amended PSPA by Treasury and the FHFA, in its capacity as conservator for Fannie Mae, was not an arm's length agreement, and was in breach of the express terms of the certificates of designation of the Series S Preferred Stock or, in the alternative, in breach of the implied covenant of good faith and fair dealing inherent in such

certificates of designation.  This action seeks an award of compensatory damages for such breach to Plaintiff and the other members of the Class and/or equitable relief with respect to such breach, including rescission of the Net Worth Sweep.

19.     Moreover, the Treasury, as *de facto* controlling stockholder of Fannie Mae, stood on both sides of the decision to implement the Net Worth Sweep.  Although the Treasury has reaped, and will reap, enormous benefits from the Net Worth Sweep, Fannie Mae received nothing in return.  As such, the Net Worth Sweep was, and is, waste and not entirely fair to Fannie Mae, and constituted a breach of the fiduciary duties owed to Fannie Mae by the FHFA and the Treasury, as Fannie Mae's controlling stockholder.  Accordingly, this action also seeks, derivatively on behalf of Fannie Mae, an award of compensatory damages and disgorgement for such breach and/or equitable relief with respect to such breach, including rescission of the Net Worth Sweep.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1723a(a) and 4617.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) in that the plaintiff and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs.  The Court also has subject matter jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have engaged in numerous activities and conducted business here, which had an effect in this district.

## THE PARTIES

22.     Plaintiff Francis J. Dennis, a citizen of New Jersey, holds Fannie Mae Series S Preferred Stock and Series T Preferred Stock both directly and through a retirement account.  He was a holder of Fannie Mae Series S Preferred Stock and Series T Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of Fannie Mae Series S Preferred Stock and Series T Preferred Stock continuously since then.  Pursuant to the certificate of designations for each of the Series S Preferred Stock and the Series T Preferred Stock, Plaintiff is entitled to a contractually specified, non-cumulative dividend from Fannie Mae in preference to dividends on junior preferred stock of Fannie Mae and on Fannie Mae's common stock, as well as a contractually specified liquidation preference.  The Treasury's Senior Preferred Stock is senior to the Series S Preferred Stock and Series T Preferred Stock.

23.     Defendant FHFA, as conservator of Fannie Mae, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street, S.W., Washington, D.C., 20024, and therefore is a citizen of the District of Columbia. According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of Fannie Mae … with responsibility of overseeing management and governance of the Enterprise[]."

24.     Defendant Treasury is an executive agency of the United States government with its headquarters located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220, and therefore is a citizen of the District of Columbia.  The Department of the Treasury owns Fannie Mae's Senior Preferred Stock and is a signatory to certain agreements central to this Complaint.

25.     Defendant and nominal defendant Fannie Mae is a federally-chartered Government-Sponsored Enterprise with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016, and therefore is a citizen of the District of Columbia.

## FACTS

A.    **FANNIE MAE**

26.    Fannie Mae was chartered by Congress in 1938, and was originally operated as an agency of the federal government, but in 1968 was reorganized into a privately-owned, for-profit corporation operating under a federal charter.  Together with Freddie Mac, Fannie Mae provides liquidity to the housing finance system by purchasing residential mortgages in the secondary mortgage market.  Fannie Mae then either holds the mortgages in its investment portfolio or packages them into mortgage-backed securities ("MBS") for resale, while the loan sellers can use the proceeds to originate additional mortgages.

27.    In the course of its operations as a for-profit entity, Fannie Mae issued both common stock and several series of preferred stock, including the Series S Preferred Stock and Series T Preferred Stock.  According to the terms of their designations, the Series S Preferred Stock and Series T Preferred Stock provided their investors with a contractual right to receive dividends and a liquidation preference over common stock and more junior preferred stock of Fannie Mae.

28.    The Series S Preferred Stock and Series T Stock were considered to be safe investments and received high credit ratings.  Prior to 2007, Fannie Mae was consistently profitable, and regularly declared and paid dividends on each series of its preferred stock, including the Series S Preferred Stock and Series T Preferred Stock.  As of December 31, 2011, Fannie Mae had 280 million shares of Series S Preferred Stock outstanding, with a stated value of $25 per share, and 89 million shares of Series T Preferred Stock outstanding, also with a stated value of $25 per share.

29.    Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws, which provides that "the corporation has elected to follow the applicable corporate governance

practices and procedures of the Delaware General Corporation Law."   Under Delaware law, preferred stock designations are deemed as amendments to a corporation's charter and are therefore generally reviewed as contracts.

30.     Section 2 of the certificate of designation for the Series S Preferred Stock provides that holders of outstanding shares of Series S Preferred Stock are entitled to receive certain non-cumulative cash dividends, and sets forth the rates and sets forth the terms under which investors are entitled to receive such dividends and the amounts to which they are entitled. In particular, it provides that:

**2. Dividends.**

(a) Holders of record of Series S Preferred Stock (each individually a "Holder," or collectively the "Holders") shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at a rate of 8.25%  per annum per share of Series S Preferred Stock.

31.     The certificates of designation for the Series S Preferred Stock and Series T Preferred Stock are largely identical.   Regarding dividends, Section 2 of the certificate of designation for the Series T Preferred Stock likewise provides that:

**2. Dividends.**

(a) Holders of record of Series T Preferred Stock (each individually a "Holder," or collectively the "Holders") will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at a rate of 8.25% per annum of the stated value of $25 per share of Series T Preferred Stock.

32.     Section 4 of the certificate of designation for the Series S Preferred Stock provides that upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payments of liabilities and expenses, holders of outstanding shares of Series S Preferred Stock are entitled to a liquidation preference in the amount of $25 per share plus certain dividend payments, before any payment or distribution of assets is made to holders of

Fannie Mae common stock or any other Fannie Mae stock ranking junior to the Series S

Preferred Stock.  In particular, it provides that:

### 4. Liquidation Rights.

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series S Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series S Preferred Stock), the amount of $25 per share plus an amount ... equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the Series S Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of the Series S Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series S Preferred Stock, the assets will be distributed to the Holders of the Series S Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any noncumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

33.    Section 4 of the certificate of distribution for the Series T Preferred Stock

likewise provides that:

### 4. Liquidation Rights.

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock), the amount of $25 per share plus an amount, determined in accordance with Section 2 above, equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued

to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series T Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series T Preferred Stock, the assets will be distributed to the Holders of Series T Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

34.     Section 7 of the Series S Preferred Stock certificate of designation provides that Fannie Mae generally possesses the right to amend, alter, repeal or supplement the terms of the certificate of designation, but only insofar as doing so "does not materially and adversely affect the interests of Holders of Series S Preferred Stock; provided, however, that any increase in the amount of authorized or issued Series S Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series S Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series S Preferred Stock."

35.     Section 7 of the Series T Preferred Stock certificate of designation provides that Fannie Mae generally possesses the right to amend, alter, repeal or supplement the terms of the certificate of designation, but only insofar as doing so "does not materially and adversely affect the interests of Holders of Series T Preferred Stock; provided, however, that any increase in the amount of authorized or issued Series T Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series T Preferred Stock, as to the

payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series T Preferred Stock."

36.     These contractual rights were essential features of the Series S Preferred Stock and Series T Preferred Stock, and represented integral fruits of the bargain to Plaintiff and the other members of the Class.  Plaintiff and the other members of the Class had both a property interest in these contractual rights, and a reasonable expectation that these contractually-specified rights would be respected.

## B.     FANNIE MAE IS PLACED INTO CONSERVATORSHIP

37.     Beginning in 2006, an industry-wide financial crisis and nationwide declines in the housing market caused Fannie Mae to suffer losses.  As the Office of Federal Housing Enterprise Oversight (the "OFHEO"), which was Fannie Mae and Freddie Mac's regulator at that time, stated in its 2007 annual report to Congress:

> In 2007, a confluence of factors – turmoil in the housing and mortgage markets, loss of liquidity in the credit marks, and volatility in the capital markets adversely impacted the financial performance of institutions . . . with significant exposure to mortgage markets.  The Enterprises' financial results suffered along with the results of other financial institutions.  Both Enterprises were unprofitable in 2007 – Freddie Mac's first annual net loss ever, and Fannie Mae's first since 1985.

38.     Despite these losses, the OFHEO continued to assure the marketplace of Fannie Mae's soundness.  For example, in a March 19, 2008 statement, OFEHO director James Lockhart said that, "Fannie Mae and Freddie Mac have played a very important and beneficial role in the mortgage markets over the last year.  Let me clear – both companies have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves.  We believe they can play an even more positive role in providing the stability and liquidity the markets need right now."  On that date, Lockhart also said that the idea of a bailout is "nonsense

in my mind.  The companies are safe and sound, and they will continue to be safe and sound." *As Crisis Grew, A Few Options Shrank To One*, N.Y. TIMES, Sept. 7, 2008.  Similarly, on June 9, 2008, OFHEO published a news release stating that Fannie Mae was "adequately capitalized as of March 31, 2008" and that it continued to maintain "overall capital levels well in excess of the requirements."

39.     In July 2008, Congress enacted HERA, establishing the FHFA to replace the OFHEO as Fannie Mae's regulator, and granting the Treasury temporary authority to assist Fannie Mae through the purchase of securities.  HERA provided a specific list of enumerated circumstances under which the FHFA would have the power to place Fannie Mae into conservatorship or receivership.  HERA was passed not because Fannie Mae or Freddie Mac was deemed to be insolvent or operating unsafely at that time, but rather, to provide the struggling mortgage and financial markets with added confidence.  As Treasury Secretary Henry Paulson testified to a Congressional panel, "If you've got a bazooka, and people know you've got it, you may not have to take it out."  *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008. Indeed, on July 10, 2008, Paulson and Federal Reserve Chairman Ben Bernanke both testified before the House Financial Services committee that Fannie Mae was adequately capitalized, and the OFHEO issued a press release stating that, as of March 31, 2008, Fannie Mae was "holding capital well in excess of the OFHEO-directed requirement[.]"

40.     Similarly, in support of HERA, Senator Isakson (R-GA) commented that:

The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans.  It is an infusion of confidence the financial markets need.  Fannie and Freddie suffer by perception from the difficulties of our mortgage market.  If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing the problem.  That wasn't Fannie Mae paper, and it wasn't securitized

by Fannie Mae.  They have $50 billion in capital, when the requirement is to have
$15 billion, so they are sound.  But the financial markets, because of the collapse
of the mortgage market, have gotten worse.

41.      Nonetheless, on September 6, 2008, the FHFA placed Fannie Mae into
conservatorship and, in a press release issued the next day, said that, "as the conservator, FHFA
will assume the power of the Board and management."  At the time, the FHFA stated that the
goal of this action was "to help restore confidence in Fannie Mae . . . enhance [its] capacity to
fulfill [its] mission, and mitigate the systemic risk that has contributed directly to the instability
in the current market."  According to the FHFA's press release, the conservatorship was "a
statutory process designed to stabilize a troubled institution with the objective of returning the
entities to normal business operations. FHFA will act as the conservator to operate the
Enterprises until they are stabilized."  The FHFA also issued a Fact Sheet indicating that,
"[u]pon the [FHFA] Director's determination that the Conservator's plan to restore [Fannie Mae]
to a safe and solvent condition has been completed successfully, the Director will issue an order
terminating the conservatorship.  At present, there is no exact time frame that can be given as to
when this conservatorship may end."  The FHFA stated that, "the common and all preferred
stocks [of Fannie Mae and Freddie Mac] will continue to remain outstanding."

42.      Regarding the imposition of the conservatorship, the FHFA's director told
investors that, among the "components of [the] conservatorship[,]" "the common stock and
preferred stock dividends will be eliminated, but the common and all preferred stocks will
continue to remain outstanding.  Subordinated debt interest and principal payments will continue
to be made."  Thus, the conservatorship did not itself involve the appropriation of any junior
preferred stock, amend any of the junior preferred stock certificates of designation, or otherwise
legally modify any contractual rights held by Plaintiff or the other members of the Class.
Moreover, the FHFA stated that it was critical to complete key regulations "so that any new

investor will understand the investment proposition," clearly implying that the FHFA intended that private investors would continue to purchase the Company's securities.

43.     In fact, the FHFA lacked an adequate statutory basis under HERA to place Fannie Mae into conservatorship.  As of that date, Fannie Mae was adequately capitalized and was not operating in an unsafe or unsound fashion.  As of June 30, 2008, Fannie Mae had assets of $885.9 billion and liabilities of $844.5 billion, such that its assets exceeded its liabilities by more than $41 billion.  Indeed, in an August 22, 2008 letter to Daniel Mudd, Fannie Mae's President and CEO, the FHFA stated, "FHFA hereby provides Fannie Mae with notice that the proposed capital classification of Fannie Mae is adequately capitalized at June 30, 2008."

44.     The decision to place Fannie Mae into conservatorship was driven not by analysis of the HERA statutory factors, but by broader macroeconomic and political concerns and the need to provide support for the struggling mortgage market.  As the NEW YORK TIMES stated, the administration sought "to shrink drastically [Fannie Mae and Freddie Mac's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades."  *In Rescue To Stabilize Lending, U.S. takes Over Mortgage Finance Titans*, N.Y. TIMES, Sept. 7, 2008.  "In the end, [Secretary of the Treasury] Mr. Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis.  Of course, for stagecraft purposes, it was played as impending disaster." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008.

45.     On September 7, 2008, Fannie Mae, acting through the FHFA in its purported capacity as conservator for Fannie Mae, and Treasury entered into a senior preferred stock purchase agreement ("PSPA") pursuant to which Fannie Mae issued a new class of stock, the Senior Preferred Stock.  Treasury purchased 1 million shares of Fannie Mae's Senior Preferred

Stock in exchange for a funding commitment that allowed Fannie Mae to draw up to $100 billion from the Treasury (this cap was later increased to $200 billion). The Senior Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws that Fannie Mae has made on Treasury's funding commitment, and entitled Treasury to a cumulative dividend of 10% percent of the outstanding liquidation preference. Absent the express consent of Treasury and the FHFA, Fannie Mae generally cannot redeem the Senior Preferred Stock. Through the PSPA, Fannie Mae also provided Treasury with warrants to purchase 79.9% of its common stock, and entered into covenants barring Fannie Mae from, *inter alia*, making any changes to its capital structure, paying any dividends (other than to Treasury), or seeking to terminate the FHFA's conservatorship without the Treasury's approval.

46.     On September 11, 2008, Fannie Mae filed with the SEC a Form 8-K disclosing further details regarding its conservatorship and the PSPA. This Form 8-K disclosed that, "FHFA, as Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of FHFA as Conservator if FHFA determines, in its sole discretion that performance of the contract is burdensome and that repudiation of the contract promotes the orderly administration of Fannie Mae's affairs. ***FHFA's right to repudiate any contract must be exercised within a reasonable period of time after its appointment as conservator.***" (emphasis added); *see also* 12 U.S.C. § 4617(d). At no time has FHFA purported to repudiate the certificates of designation for the Series S Preferred Stock or Series T Preferred Stock.

47.     Regarding the terms of the Senior Preferred Stock purchased by Treasury, the September 11, 2008 8-K reported that:

> The Senior Preferred Stock ranks prior to Fannie Mae common stock and all outstanding series of Fannie Mae preferred stock (which are listed in Item 3.03 above), as well as any Fannie Mae capital stock issued in the future, ***as to both dividends and rights upon liquidation.*** The Certificate of Designation for the

Senior Preferred Stock provides that Fannie Mae may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (a) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current dividend period and all past dividend periods (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash have been paid in cash.

(emphasis added).

48.     The 8-K clearly contemplated that rather than permanently terminating the rights of preferred stockholders to dividends, the conservatorship and the stock purchase agreement would only suspend dividend payments until such time as all cumulative dividends had been paid in cash on the Senior Preferred Stock and the Treasury's commitment to provide funding had been terminated.

49.     Soon after the commencement of the conservatorship, Fannie Mae declared huge non-cash losses, including write-downs of the value of tax assets and loss reserves.  As of December 31, 2008, Fannie Mae had established combined loss reserves of $24.8 billion (as compared to $3.4 billion as of December 31, 2007).

50.     Under the initial PSPA, Treasury committed to make quarterly payments to Fannie Mae in order to maintain a zero net worth.  Each quarter, the FHFA looked to Fannie Mae's financial statements to determine if its liabilities exceeded its assets.  If so, the FHFA would request that Treasury draw down Fannie Mae's funding commitment and provide funds equal to the net worth deficit.  As of December 31, 2012, Fannie Mae had drawn $116.1 billion from Treasury and paid Treasury $31.4 billion in dividends.  These draws were largely necessitated by the tax write-downs and loss reserves, which had greatly depleted Fannie Mae's balance sheet.

C.      **FANNIE MAE DEMONSTRATES SIGNS OF A STRONG RECOVERY AND SUBSTANTIAL PROFITABILITY**

51.     In 2012, Fannie Mae began to show signs of a strong recovery.  In the first quarter of the year Fannie Mae reported a $2.7 billion profit, followed by a $5.1 billion profit in the second quarter.  Its earnings for the first half of the year alone were more than the company's annual earnings for any year except 2003.  As the WALL STREET JOURNAL reported, "The results hint at the tremendous earnings potential at Fannie and Freddie once home prices have stabilized and now that they have replaced the risky loan books with the newer credit portfolio." *Fannie Mae Posts Profit As Home Prices Rise*, WALL ST. JOURNAL, Aug. 8, 2012.

52.     The market prices of the Series S Preferred Stock (and other series of Fannie Mae preferred stock) increased substantially as investors realized what a strong comeback the Company was making.  On January 3, 2012, the closing price of the Series S Preferred Stock was $1.41.  On August 16, 2012, it closed at $2.35 – a 66% gain.

53.     Likewise, on January 3, 2012, the closing price of the Series T Preferred Stock was $1.43.  On August 16, 2012, it closed at $2.65 – an 85% gain.

D.      **THE FHFA AND THE TREASURY EFFECTIVELY SEIZE ALL OF FANNIE MAE'S PROFITS IN PERPETUITY THROUGH THE NET WORTH SWEEP**

54.     In order to capitalize on Fannie Mae's strong recovery (and ensure that Fannie Mae's shareholders could not capitalize on it), Treasury and the FHFA decided to amend the PSPA such that rather than taking 10% of the liquidation preference as a dividend, Treasury would instead take ***the entire positive net worth of Fannie Mae each quarter*** (the "Net Worth Sweep").

55.     In an August 17, 2012 press release announcing the modification of the PSPA, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie

Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." It called the amendment a full income sweep of "every dollar of profit that [the] firm earns going forward," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." This language was in stark contrast to their earlier representations that they sought only to "stabilize" Fannie Mae and return it "to normal business operations" (as well as the February 2, 2010 statement of Edward DeMarco, Acting Director of the FHFA, that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute [Fannie Mae] under [its] current charter[]"). While there is presently a $3 billion buffer in place, so that for 2013 Fannie Mae is only required to pay out dividends in the amount of which its positive net worth exceeds $3 billion, this buffer shrinks by $600 million per year and will disappear entirely as of January 1, 2018.

56.     Around the time that the Net Worth Sweep was entered into, Fannie Mae was considering whether it could release tens of billions of dollars in deferred tax assets that it had written down in 2008. The Company ultimately decided to release that allowance as of March 31, 2013, resulting in a $50.6 billion benefit to its balance sheet. In essence, the Company decided that it was more likely than not that it would be profitable enough in the future to make use of those accumulated tax deductions. As evidence supporting this decision, the Company cited to (a) its profitability in 2012 and the first quarter of 2013 and its expectations regarding the sustainability of those profits; (b) its three-year cumulative income position as of March 31,

2013; (c) the strong credit profile of the loans it had acquired since 2009; (d) the significant size of its guaranty book of business and its contractual rights for future revenue from that book of business; (e) its taxable income for 2012 and its expectation regarding the likelihood of future taxable income; and (f) that the deductions would not expire until 2030-31, while it expected to utilize all of those carryforwards within the next few years.  This extraordinary turnaround demonstrates the Company's strong position in 2012, and reflects the profits that the FHFA and the Treasury expected to capture through the Net Worth Sweep.

57.    As FORTUNE magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement?  By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players.  Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, FORTUNE, July 8, 2013.

58.    The Net Worth Sweep constituted a massive appropriation of value from Fannie Mae.  While the Company was on track to repay Treasury and the taxpayers every dollar they were owed with interest, this was not enough for the FHFA and Treasury.  Rather, the FHFA and the Treasury chose to seize the totality of the Company's profits in perpetuity.  The President's proposed fiscal year 2014 budget estimates that Fannie Mae and Freddie Mac will together pay $238.5 billion in dividends to Treasury over the next ten years, far outstripping the government's investments.  Even this figure likely underestimates the total value of the dividends that Treasury is likely to receive via the Net Worth Sweep, since the budget was released before Fannie Mae announced its decision to release its deferred tax assets.

59.     The Net Worth Sweep has already resulted in historic dividend payments to the Treasury.  In 2012 Fannie Mae paid Treasury $11.6 billion in dividends, in the first quarter of 2013 Fannie Mae paid Treasury a dividend of $4.2 billion, and in the second quarter of 2013, Fannie Mae paid Treasury a dividend of *$59.4 billion*.  As of June 30, 2013, Fannie Mae had paid Treasury $95 billion in dividends (having received a total of $116.1 billion in funds).

60.     However, under the PSPA, even these substantial payments do not reduce the Company's obligation to the Treasury, since dividend payments cannot be used to offset prior Treasury draws.  Accordingly, Treasury still maintains a liquidation preference of $117.1 billion (the $116.1 billion in drawdowns plus the initial liquidation preference of $1 billion) that Fannie Mae has no way to pay down, no matter how much cash it contributes to the Treasury's coffers.

61.     Significantly, the Net Worth Sweep did *not* constitute the issuance of a new class or series of stock, but rather, was an amendment to the terms of the senior preferred stock that Fannie had issued and the Treasury had purchased in September 2008.  This is important because, absent super-majority approval by the respective holders of Series S Preferred Stock or Series T Preferred Stock, Section 7 of the certificates of designation for the Series S Preferred Stock and Series T Preferred Stock prohibited Fannie Mae from taking action that would "materially and adversely affect the interests of [those preferred stockholders]; provided, however, that . . . the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the [Series S Preferred Stock or Series T Preferred Stock, respectively], as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the [those preferred stockholders]."

62.     Because the Net Worth Sweep did not constitute the creation and issuance of a new series of Fannie Mae stock, or an increase in the authorized or issued amount of a class or series of Fannie Mae stock, it did not fall within the safe harbor for new stock issuances set by Section 7.

63.     Furthermore, under HERA, Treasury's authority to purchase Fannie Mae securities expired at the end of 2009.  Thus, the Net Worth Sweep, which was entered into in August 2012, would have exceeded Treasury's statutory powers if it did constitute the issuance and purchase of a new class or series of Fannie Mae Stock.

64.     In addition, the implied covenant of good faith and fair dealing is inherent in the certificates of designation of the Series S Preferred Stock and the Series T Preferred Stock.

65.     The certificates of designation entitled the holders of Series S Preferred Stock and the Series T Preferred Stock to contractually-specified dividend and liquidation preference payments.

66.     Notwithstanding the Defendants' implementation of the Net Worth Sweep, these provisions of the certificates of designation, along with Section 7 of the certificates of designation, necessarily implied that such rights and interests in dividends and liquidation preference payments could not be eliminated.

67.     Even assuming, *arguendo*, that Fannie Mae and the FHFA had some degree of discretion to modify the rights of the Senior Preferred Stock such that the modification would affect the dividend and liquidating preference rights and interests of the holders of Series S Preferred Stock and the Series T Preferred Stock, they could not use that discretion arbitrarily and unreasonably.  Yet, in effectuating the Net Worth Sweep, Fannie Mae and the FHFA did act arbitrarily and unreasonably, with the purpose of effectively eliminating altogether the dividend

and liquidating preference rights and interests of the holders of Series S Preferred Stock and the Series T Preferred Stock.  In doing so, they frustrated the fruits of the bargain that the holders of Series S Preferred Stock and the Series T Preferred Stock reasonably expected even if it is determined that they did not breach the express terms of the certificates of designation.

### E.   BY ENTERING INTO THE NET WORTH SWEEP, THE FHFA AND THE TREASURY VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FANNIE MAE

68.   By reason of its purported conservatorship of Fannie Mae and because of its ability to control the business and corporate affairs of Fannie Mae, the FHFA owed Fannie Mae and its shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and was and is required to use its utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  The FHFA was and is required to act in furtherance of the best interests of Fannie Mae and its shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of the FHFA, the Treasury, or the federal government.  Because of its position of control and authority as the purported conservator of Fannie Mae, the FHFA was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.   The Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock and warrants to purchase Fannie Mae common stock, as well as its control of the provision of funds to Fannie Mae.  As controlling stockholder of Fannie Mae, the Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its other stockholders.  Because of the Treasury's *de facto* position of control and authority over Fannie Mae, it stood on both sides of the decision to engage in the Net Worth Sweep and it was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     The Net Worth Sweep offered no benefits whatsoever to Fannie Mae or its minority shareholders.  Rather, it was an egregiously self-dealing transaction, the benefits of which flowed entirely to the Treasury as Fannie Mae's controlling shareholder, and indirectly to the FHFA through its status an agency of the federal government.

71.     The Net Worth Sweep was in no way an exercise of valid business judgment or deemed to be in the best interests of Fannie Mae.  Indeed, it was specifically intended to ensure that Fannie Mae's shareholders could never again recover any value from their investments, and to ensure that the Company could not function as a private enterprise and would have to be wound down.  By preventing Fannie Mae from rebuilding capital or returning to the market, as Treasury stated in its press release, the purpose and effects of the Net Worth Sweep ran directly contrary to the FHFA's purported statutory mission to "put the regulated entity in a sound and solvent condition," "carry on the business of the regulated entity," and "preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).

### CLASS ACTION ALLEGATIONS

72.     With respect to Counts I and II hereof, Plaintiff brings this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Series S Preferred Stock or Series T Preferred Stock prior to August 17, 2012, and who were damaged thereby (the "Class").  Excluded from the Class are the Defendants.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class.  As of December 31, 2012, Fannie Mae had 280 million shares of Series S Preferred Stock outstanding, and 89 million shares of Series T

Preferred Stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Fannie Mae and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Series S Preferred Stock or Series T Preferred Stock during the class period and were similarly affected by Defendants' wrongful conduct that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, derivative and securities litigation.  Plaintiff has no interests that are adverse or antagonistic to the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

77.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a) Whether one or more Defendants breached the terms of the certificate of designation for the Series S Preferred Stock or, in the alternative, the implied covenant of good faith and fair dealing inherent in that certificate of designation;

b) Whether one or more Defendants breached the terms of the certificate of designation for the Series T Preferred Stock or, in the alternative, the implied covenant of good faith and fair dealing inherent in that certificate of designation;

c) Whether the Treasury breached its fiduciary duties to the members of the Class;

d) Whether the FHFA was acting within its authority as a conservator at the time it entered into the Net Worth Sweep; and

e) Whether the members of the Class are entitled to injunctive relief, including rescission, and/or one or more Defendants are liable for damages to the members of the Class, and the proper measure thereof, for breaches of contract, the implied covenant of good faith and fair dealing, and/or breach of fiduciary duty.

78.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

79.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### FHFA'S MANIFEST CONFLICT OF INTEREST

80.     With respect to Count III hereof, Plaintiff brings action derivatively on behalf of and for the benefit of Fannie Mae to redress injuries suffered by Fannie Mae as a direct and proximate result of the breaches of fiduciary duty alleged herein.   For purposes of Count III, Fannie Mae is named as a nominal defendant in a derivative capacity.

81.     Plaintiff is a holder of Fannie Mae Series S Preferred Stock and Series T Preferred Stock, was a holder of Fannie Mae Series S Preferred Stock and Series T Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of Fannie Mae Series S Preferred Stock and Series T Preferred Stock continuously since then.  Plaintiff has retained counsel that is competent and experienced in class action, derivative and securities litigation.

82.     Plaintiff intends to retain his shares of Series S Preferred Stock and Series T Preferred Stock throughout the duration of this litigation.

83.     The breaches of fiduciary duty complained of herein subject, and will persist in subjecting, Fannie Mae to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

84.     To the extent any demand requirement with respect to the FHFA would otherwise be applicable in this context, such demand is excused and Plaintiff is entitled to pursue the derivative claim alleged herein as a result of the FHFA's manifest conflict of interest.

85.     The Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock and warrants to purchase Fannie Mae common stock, as well as its control of the provision of funds to Fannie Mae.  The Secretary of the Treasury also sits on the FHFA Oversight Board.  With such *de facto* power over Fannie Mae's strategy and operations, the Treasury is in a position to, and does, direct the FHFA with respect to determinations affecting Fannie Mae and its stockholders.

86.     The FHFA is interested in and benefits from the Net Worth Sweep as an agency of the federal government, and cannot reasonably be expected to initiate litigation for the breaches of fiduciary duty alleged herein, which would be asserted against itself and the Treasury, Fannie Mae's controlling stockholder.  Indeed, the Treasury and FHFA face a substantial threat of liability with respect to the breach of fiduciary duty claim.

87.     Notwithstanding its fiduciary duties to Fannie Mae and its stockholders, the FHFA has expressly acknowledged that it does not act with the interests of Fannie Mae shareholders in mind.  Indeed, in the Company's 2008 10-K, it frankly disclosed that, since the

imposition of the conservatorship, it was "[n]o longer managed with a strategy to maximize common shareholder returns."

88.     Accordingly, the FHFA has a manifest conflict of interest that makes it incapable of pursing the derivative claim for breach of fiduciary duty alleged herein.  Given the Treasury's *de facto* controlling stockholder status and the FHFA's close relationship to the Treasury in connection with Fannie Mae matters, a derivative action offers the only reasonable avenue for the pursuit of the breach of fiduciary duty claim.

### CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

### (Against Fannie Mae and the FHFA)

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     The certificates of designation for the Series S Preferred Stock and Series T Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Class and Fannie Mae.

91.     The certificates of designation for the Series S Preferred Stock and for the Series T Preferred Stock provide for contractually-specified dividend rights and liquidation preferences for the holders of Series S Preferred Stock and Series T Preferred Stock.

92.     As Fannie Mae's conservator, the FHFA also became obligated to act consistently with Fannie Mae's responsibilities under the certificates of designation.

93.     By entering into the Net Worth Sweep so as to effectively deprive Plaintiff and the other members of the Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through the FHFA, breached the terms of the certificates of

designation for the Series S Preferred Stock and for the Series T Preferred Stock.  The Net Worth

Sweep amends, alters, supplements or repeals the contractually-specified dividend rights and

liquidation preferences of the holders of Series S Preferred Stock and Series T Preferred Stock in

a manner that materially affects the interests of the holders of Series S Preferred Stock and Series

T Preferred Stock without the required consent of such holders of Series S Preferred Stock and

Series T Preferred Stock.

94.     Plaintiff and the other members of the Class suffered damages as a direct and

proximate result of the forgoing breach of contact.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

**(Against Fannie Mae and the FHFA)**

95.     Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

96.     Plaintiff asserts this Count II in the alternative to Count I hereof, to the extent it is

determined that no breach of contract occurred as alleged in Count I.

97.     The certificates of designation for the Series S Preferred Stock and Series T

Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of

the Class and Fannie Mae.

98.     Inherent in these contracts was, and is, an implied covenant of good faith and fair

dealing, requiring Fannie Mae to deal fairly with Plaintiff and the other members of the Class, to

fulfill its obligations to Plaintiff and the Class in good faith, and not to deprive Plaintiff and the

Class of the fruits of their bargain.

99.     As Fannie Mae's conservator, the FHFA also became obligated to act consistently with Fannie Mae's responsibilities under the implied covenant of good faith and fair dealing.

100.     By entering into the Net Worth Sweep with the purpose of effectively depriving Plaintiff and the other members of the Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through the FHFA, breached the implied covenant of good faith and fair dealing inherent in the certificates of designation for the Series S Preferred Stock and for the Series T Preferred Stock.  Through the implied covenant of good faith and fair dealing, Fannie Mae, acting through the FHFA, was obligated not to eliminate the rights and interests of the Class in receiving dividends or a liquidation preference.   In effectively eliminating such rights and interests entirely through the Net Worth Sweep, Fannie Mae, acting through the FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Class.

101.     Plaintiff and the other members of the Class suffered damages as a direct and proximate result of the forgoing breach of contact.

## COUNT III
## BREACH OF FIDUCIARY DUTY

### (Against the Treasury and the FHFA)

102.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.     By imposing a conservatorship over Fannie Mae, through which the FHFA assumed the powers of its officers and directors, the FHFA assumed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its stockholders, including Plaintiff and the other members of the Class, and were and are required to use their utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  The FHFA was and is required

to act in furtherance of the best interests of Fannie Mae and its shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of the FHFA, the Treasury, or the federal government.

104.    The Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock and warrants to purchase Fannie Mae common stock, as well as its control of the provision of funds to Fannie Mae.  As controlling stockholder of Fannie Mae, the Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its other stockholders.

105.    The Net Worth Sweep constituted a self-dealing transaction.  The Treasury, as controlling stockholder of Fannie Mae, stood on both sides of the decision to implement the Net Worth Sweep, to the benefit of the Treasury and the detriment of Fannie Mae and its stockholders other than the Treasury.  Moreover, as an agency of the federal government, the FHFA was interested in and benefited from the Net Worth Sweep.

106.    Through the Net Worth Sweep, the FHFA and the Treasury breached their fiduciary duties to Fannie Mae.  The Net Worth Sweep transaction was not entirely fair to Fannie Mae, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Net Worth Sweep, which effectively delivers all of Fannie Mae's profits to the Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae in return.

107.    The Net Worth Sweep was neither entirely nor intrinsically fair, nor did it further any valid business purpose of Fannie Mae, nor did it reflect a good faith business judgment as to what was in the best interests of Fannie Mae or its shareholders.

108.    The Net Worth Sweep constituted waste and a gross abuse of discretion.

109.     As a direct and proximate result of the foregoing breach of fiduciary duty, Fannie

Mae suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.     Determining that this action is a proper class action under Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.     Determining that Plaintiff may maintain this action on behalf of Fannie Mae and

that Plaintiff is an adequate representative of Fannie Mae, and that this action is a proper

derivative action maintainable under law and that, to the extent any demand requirement may

otherwise apply, such demand is excused;

3.     Declaring that defendants Fannie Mae and the FHFA breached the express terms

of the certificates of designation of the Series S Preferred Stock and Series T Preferred Stock or,

in the alternative, breached the implied covenant of good faith and fair dealing inherent in the

certificates of designation of the Series S Preferred Stock and Series T Preferred Stock;

4.     Awarding compensatory damages in favor of Plaintiff and the other Class

members against defendants Fannie Mae and the FHFA, jointly and severally, for all damages

sustained as a result of such defendants' breach of the express terms of the certificates of

designation or, in the alternative, breach of the implied covenant of good faith and fair dealing,

in an amount to be proven at trial, including interest thereon;

5.     Declaring that the Net Worth Sweep was neither entirely nor intrinsically fair to

Fannie Mae, did not further any valid business purpose of Fannie Mae, did not reflect a good

faith business judgment as to what was in the best interests of Fannie Mae or its shareholders,

and constituted waste and a gross abuse of discretion;

6.      Declaring that, through the Net Worth Sweep, defendants the FHFA and the Treasury breached their respective fiduciary duties to Fannie Mae;

7.      Awarding compensatory damages and disgorgement in favor of Fannie Mae against defendants the FHFA and the Treasury, jointly and severally, as a result of such defendants' breach of their respective fiduciary duties, in an amount to be proven at trial, including interest thereon;

8.      Granting equitable relief, including rescission of the Net Worth Sweep;

9.      Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

10.      Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  August 5, 2013

Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

/s/ Reuben A. Guttman
Reuben A. Guttman (Bar No. 414781)
1920 L Street, N.W., Suite 400
Washington, D.C.  20036
Telephone:  (202) 386-9500
Facsimile:  (202) 386-9505
rguttman@gelaw.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
485 Lexington Avenue
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501
jeisenhofer@gelaw.com

**GRANT & EISENHOFER P.A.**
Geoffrey C. Jarvis
123 Justison Street
Wilmington, DE  19801
Telephone:  (302) 622-7000
Facsimile:  (302) 622-7100
gjarvis@gelaw.com

*Attorneys for Plaintiff*